United States v. Ray is our fifth case for argument this morning. Ms. Lang. May it please the court. My name is Courtney Lang and I represent the defendant appellant Mary Ray. As outlined in her reply brief and in her notice to the court, Ms. Ray withdrew her second issue for appeal regarding the vulnerable victim enhancement and so today I'll be arguing one issue that there is insufficient evidence at trial for the jury to convict Ms. Ray of wire fraud. Before turning to the elements of wire fraud and what the government was required to prove at trial, I'd like to briefly contextualize this issue, recognizing the high standard of review that insufficiency of the evidence entails. I'd like to contextualize this issue in the context of trial. Ms. Ray was convicted in the Northern District of Indiana of three crimes, theft of government funds, failure to report income on her income taxes, and wire fraud. The first two of those crimes related to her position as Chief Deputy Auditor of LaPorte County and the third crime related to her relationship to her father-in-law Norman Ray. A separate and distinct set of facts undergird those first two crimes and the last crime and the vast majority of trial was devoted to the government theft crime. Twenty witnesses testified over the course of a four-day trial regarding the government theft and by contrast, only two witnesses testified regarding the wire fraud. Similarly, two witnesses testified regarding Ms. Ray's gambling activities which came in under a defense objection. Okay, so just because the 20 versus 2 analysis is not really carrying the day for me, because the two can have dynamite testimony, which is what happened here. Well, Your Honor- The father-in-law, his situation, I mean, her withdrawals, the gambling, setting up a separate account. Our money is supposed to be for the three of us and yet she sets up a separate account. I mean, the witnesses that did testify on it were dynamite witnesses. Well, Your Honor, there were two witnesses that testified, Norman Ray, the father-in-law, and Matthew Maldia, who is the IRS agent, testifying about account transfers. Exactly. And in Norman Ray's testimony, he repeatedly stated that the funds at issue were our money, our, referring to himself, his son Michael, and Ms. Ray, the defendant appellant in this case. Not only did he repeatedly state that the funds were our money, but the funds themselves that were spent and transferred in this case derived from joint accounts with rights of survivorship. And so Ms. Ray was not merely a co-signatory on these accounts. She was actually a joint account holder of the funds that were transferred and spent. But don't you think the jury could take into account things like his memory issues, like he couldn't name the current president or any of the banks where the accounts were, all of the issues with him, and then other things that he testified, that he didn't want them to spend all the money, that it was supposed to be used for the needs of all three of us, he didn't want his money spent at casinos? I mean, the jury could look at the whole picture and put it together. Certainly, the jury is entitled to make a credibility determination here of Norman Ray's testimony. But I think if I could consolidate it to kind of three key points. The first is that these were joint accounts with rights of survivorship, in which Mary Ray, the defendant appellant, was a joint account holder with full rights to utilize and spend the funds. Norman Ray repeated at trial that the funds were our money. And furthermore, when asked at trial how he planned to leave his estate, he indicated that he was leaving his estate except for $1 to Ms. Ray and her husband, and despite all that transpired in the course of trial, his will reflected this same intention, and he testified that he had not changed it. And so I think there is a consistent thread reflected not only in his testimony but also in his actions. Finally, Norman Ray submits a letter to the court of sentencing saying, I don't understand what happened in this case, saying specifically as of March 2013, this money was our money, Mike, Mary, and myself, asking how can they steal from themselves. Why was the money switched from the joint account for our money to her personal account? Yes. And his name wasn't on it. Correct. So Ms. Ray did, in fact, write checks to herself from the joint account that then went into, I believe, a joint account with her and her husband or a separate account in some instances. Right, but he wasn't, what I'm saying is, yeah, Mr., I mean, Norman was not on that account. And I would argue, Your Honor, that as a joint account holder, she had a right to transfer and spend funds. And if I could draw you at trial to government Exhibit 5, that's not the only way funds were transferred and spent. There were also cash withdrawals directly from the joint account. There were also debt payments made from the joint account. So if it were only a matter of writing checks. And debt payments, were those Norman's debt payments? No, those were Ms. Ray's debt payments. So, in fact, we do not contest that she transferred and spent money and transferred and spent it for herself. And transferred and spent it at casinos. Right, because the vast majority of funds were all her, nothing Norman. Correct, correct. There was a portion, I believe there was one transfer that was spent to cover Norman's housing expenses at the retirement facility that he lived at. However, our argument is that she had a right as a joint account holder to transfer and spend those funds. And I think what's critical here in just analyzing the sufficiency of the evidence is that there was no evidence presented regarding any fraud, any misrepresentation about the joint account itself. We don't know about any conversations between Norman Ray and Mary Ray when those joint accounts were set up. All we know is that when Norman Ray relocated from Florida to Indiana shortly before his move in March of 2013, that he went with Mary Ray to three different banks in LaPorte, Indiana and set up these joint accounts.  There's no evidence that he didn't understand what he was doing in designating the joint accounts with rights of survivorship. It's a checked box that clearly states joint account with right of survivorship. So we would argue here that, in fact, Mary Ray believed that she had a right to spend these funds. That's reflected in Norman's statements at trial that the money is our money. It's reflected in his letter to the court at sentencing that indicates that the money was shared money between the three of them. So for those reasons, we would ask you to reconsider the evidence in this trial and to vacate the conviction. Thank you, Ms. Lang. Mr. Holler. Thank you. Good morning, Your Honors, and may it please the court. The jury did not commit a manifest miscarriage of justice in convicting Ray of fraud. Instead, it quite rationally and correctly concluded that Ray had obtained control of her father-in-law's assets through fraud and had taken that money unlawfully. Your Honor, I guess to respond briefly to essentially the three or four core points that Ms. Lang has stated on her client's behalf, in the first place, Your Honor, the crux of the fraud here was getting control of the assets, was getting control of them to put them in the joint accounts with right of survivorship. So the fact that they're there, the fraud in large measure has already occurred. At the time that that happens, in March of 2013, she also has Mr. Ray sign a power of attorney that is in the record, and that document reflected that she was going to get reasonable expenses, you know, any fees that she incurred in doing this, and she was going to take no more than $10,000 per year in gifts. And instead, she then takes Mr. Ray around, Norman Ray around to a bunch of different banks, deposits all the money, and then wipes it all. So that's the fraud. The fraud is just as we had witnesses testify, many of the witnesses testified who worked for LaPorte County. We were under the impression that she didn't gamble very much. We were under the impression that when she gambled, she was a winner, not that she was losing over $100,000 a year gambling. And similarly, Norman Ray testified, you know, my intent was that she could have this money if she needed it. And the key question, perhaps, Your Honor, was on page 18 of the transcript, and they asked, you know, did you want her to spend the money on gambling? Isn't it true that back then, and today still, you did not want your money to be spent at casinos? Answer, yes, sir. So that's the evidence of the fraud is that this money was being given to her for a specific purpose, which was to be used by Norman during his lifetime and by Ms. Ray if she needed it, and that that's what the purpose of the money was. As far as leaving the estate to Ms. Ray and to Michael, the evidence about why that occurred was essentially because, and this is on page 22 and 23 of the transcript, Volume 3, that the other son, Martin, couldn't be trusted to handle his financial affairs and didn't deserve his money because he and his wife were spendthrifts. And I don't know on this record that you could conclude anything other than that Ms. Ray had concealed from her father-in-law that she and her husband were also spendthrifts. They declared bankruptcy in 2010. They were obtaining money for 2011 and 2012 by stealing it from LaPorte County, and then when that money ran out for two months, she spent down all of her comps that she'd earned by gambling so much at the casinos, and then a month later she turns around and obtains access to this $600,000 cash cow from her father-in-law. Your Honor, the jury could hear this testimony, and the jury could recognize, just as the district court recognized, frankly, in imposing the vulnerable victim enhancement, which I'm aware that my opponent has withdrawn, that Mr. Ray was 84 years old, that he was entirely dependent for his financial affairs, frankly, for his personal life, for getting around. He could drive a car, but he didn't. He let his son and his daughter-in-law do that, and that for all those reasons, that she was in control of his financial affairs, and she took advantage of that fact, and she did defraud him. All of that evidence, Your Honor, was certainly more than enough for the jury to conclude that the defendant was guilty of fraud. And again, we're not even just on the bare sufficiency standard. A defense counsel at trial said, I don't see any basis for filing a Rule 29 motion. So she has to prove not just that a rational jury could conclude this, but that a manifest miscarriage of justice occurred. No manifest miscarriage of justice occurred here, Your Honor. The defendant stole over $600,000 from her father-in-law, just like she stole over $150,000 from LaPorte County. She was justly convicted for those offenses, and we would ask that this court affirm. If the court has no further questions, I'll rest on my brief. Thank you, Mr. Haller. Thank you. Anything further, Ms. Lane? So, Your Honors, for some of the points that have been raised, I think that they actually highlight the potential prejudice that the jury might have experienced in this case when it was tasked with weighing each element of the charged crime of wire fraud and actually determining was there sufficient evidence for each element. And some of that prejudice that's been highlighted is a significant amount of gambling evidence was admitted in this case. Granted, we concede that it was rightfully admitted, but nonetheless, one of the purposes for which it was admitted was to show the identity of who committed the government theft. Yet, for the purposes of the wire fraud here, where we posit that she had a right granted by her father-in-law to spend these funds, it actually has a severe danger of prejudice, that the jury is going to assume that just because she gambles heavily that she also must have stolen this money from her father-in-law. And regarding the power of attorney, she did in fact have a power of attorney with financial control over her father-in-law. That power of attorney covered a set of different aspects of how she was providing caregiving to him. And I think a key distinction that needs to be made is that the joint accounts provide an independent basis for her to have access to these funds. Ms. Ray was not merely spending the funds via the power of attorney, but she was spending the funds because she was a joint account holder entitled to do so. So, if there are no further questions, we ask that you reconsider that. Thank you. Thank you, Ms. Lang. And we appreciate your willingness to accept the appointment in this case and your assistance to both the client and the court. The case is taken under advisement.